9th Circuit No. 24-3406

IN THE UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff-Appellee,<br><br><br>v.<br><br>DONTE JAMAL MCCLELLON,<br><br>Defendant-Appellant. | U.S District Court Case No. 2:22-cr-00073-LK-1. (Western District of Washington) |

**Appellant's Opening Brief**

United States District Court
Western District of Washington
Hon. Lauren King, United States District Judge


Gene D. Vorobyov, California Bar No. 200193
2309 Noriega Street, # 46
San Francisco, CA 94122
(415) 425-2693, gene.law@gmail.com

Attorney for Appellant
DONTE JAMAL MCCLELLON

# Table of Contents

Table of Authorities……………………………………………iv

Statement of Issue Presented for Review………………..………2

Jurisdiction and Timeliness………………………..……………2

Appellant's Custody Status…………………………………………3

Statement of the Case………………………………………………3

Statement of Facts

    A.    The Government's Case

        1.    PPP and general industry practices …………………………………………………4

        2.    Frostlake, L.L.C. loan…………………..……5

        3.    Skylake, L.L.C., loan…………………………9

        4.    Cannonlake, L.L.C, loan……………………10

        5.    Use of the wires in Counts 1-3 and the bank fraud counts 4-5………………..……………10

        6.    The investigation and trial…………………11

    B.    The Defense Case…………………………..……14

Summary of Argument…………………………………………14

Argument

The District Court Erred in Enhancing McClellon's Offense Level Based on "Intended Loss" Because the Fraud Guideline Definition of Loss Unambiguously Refers Only to "Actual Loss;" the "Intended Loss" Directive Comes only

i

from Guideline Commentary that Erroneously Expanded the
Fraud Guideline Scope

A.    Factual Background..............................................16

B.    The Standard of Review is De Novo.......................17

C.    The District Court Erred in Relying on Intended Loss
      Because USSG § 2B1.1 Use of "Loss" Unambiguously
      Refers to Actual Loss

      1.    Guideline commentary cannot expand the reach
            of guideline provisions.................................20

      2.    Application Note 3(A), which defines loss under
            USSG 2B1.1 as the greater of actual or intended
            loss, improperly expands the reach of the
            guideline; the plain meaning of loss here is actual
            loss............................................................23

      3.    The Fourth Circuit's 2-1 decision in *Boler* does
            not compel a different result; this Court should
            instead follow *Banks* and the *Boler* dissent
            ...............................................................26

      4.    This Court should vacate McClellon's sentence
            and remand for resentencing without the
            intended loss enhancement............................30

D.    The Court Should Not Review for Plain Error; But the
      Error Here Requires a New Sentencing Hearing Even
      Under Plain-error Review

      1.    This Court should review the issue de novo
            because it is a purely legal question and
            addressing it for the first time on appeal would
            not prejudice the Government.......................31

ii

2.    McClellon should prevail even under the plain-error standard…………………………………..33

Conclusion……………………………………………………………..37

Certificate of Word Count

Certificate of Related Cases

# Table of Authorities

**Cases**

*Supreme Court*

Henderson v. United States
568 U.S. 266, 273 (2013

Kisor v. Wilkie
588 U.S. 558 (2019)……………………………….…………*passim*

Rosales-Mireles v. United States
585 U.S. 129, (2018)……………………………….……………37

Stinson v. United States
508 U.S. 36 (1993)……………………………………..……….21

*Circuit Cases*

Miller v. Gammie
335 F.3d 889 (9th Cir. 2003) …………………………………19

United States v. Banks
55 F.4th 246 (3d Cir. 2022)……….…………16, 17, 24, 25, 26.

United States v. Benlevi
No. 22-50163, 2024 WL 5375881 (9th Cir. Feb. 4, 2025)
……………………………………………………………………33

United States v. Boler
15 F.4th 316 (4th Cir. 2024)………………………….…………26

United States v. Castillo
69 F.4th 648 (9th Cir. 2023)        …..…16, 21, 22, 23, 25, 32, 35

iv

United States v. Gomez
115 F.4th 987 (9th Cir. 2024)……………………..……………….31

United States v. Hackett,
 2024 W 5151127 (9th Cir. 2024)……………………………….19

United States v. Hanson
936 F.3d 876 (9th Cir. 2019)……………………………… …....37

United States v. Irons
31 F.4th 702 (9th Cir. 2022)………………………………………34

United States v. Kirilyuk
29 F.4th 1128 (9th Cir. 2022)………………………….25, 33, 35

United States v. Klensch
87 F.4th 1159 (9th Cir. 2023) ……………………………………30

United States v. Korotkiy
118 F.4th 1202 (9th Cir. 2024)……………………………….24

United States v. McAdory
935 F.3d 838 (9th Cir. 2019)………………………………………31

United States v. Pallares-Galan
359 F.3d 1088 (9th Cir. 2004)………………..……………17, 18

United States v. Smith
79 F.4th 790 (6th Cir. 2023)………………………………………38

United States v. Waknine
543 F.3d 546, (9th Cir. 2008)………………………..……………34

United States v. You
74 F.4th 378 (6th Cir. 2023)………………………..……………..37

v

**Statutes**

18 U.S.C. § 3742............................................................2

28 U.S.C.

    § 1291.....................................................................2

    § 3231.....................................................................2

**Secondary Sources**

U.S. Sentencing Guideline
§ 2B1.1................................................................passim

**Statement of Issue Presented for Review**

A jury convicted McClellan of three counts of wire fraud and two counts of bank fraud.  In determining McClellon's advisory Guideline range at sentencing, the district court calculated the loss enhancement under U.S. Sentencing Guideline § 2B1.1 using the intended loss of $743,996, instead of the actual loss of $500,948.

The question presented for review is whether the district court erred in calculating McClellon's loss enhancement using intended loss because § 2B1.1(b) unambiguously refers to only actual loss and the intended loss appears only in § 2B1.1 commentary that unlawfully expanded that guideline's reach?

**Jurisdiction and Timeliness**

This appeal is from a final judgment filed May 29, 2024, Appellant filed a timely notice of appeal May 29, 2024..

This Court has jurisdiction over this appeal under 28 U.S.C. § 1291 and 18 U.S.C. § 3742.  The district court had jurisdiction under 28 U.S.C. § 3231.

- 2 -

**Appellant's Custody Status**

McClellon is in the Government's custody serving his sentence. According to the Bureau of Prison's website, his projected release date is November 02, 2025. McClellon is not out on bail pending completion of this appeal.

**Statement of Case**

A grand jury indicted McClellon on three counts of wire fraud and two counts of bank fraud, all related to the alleged submission of false documents as a part of the Paycheck Protection Program ("PPP"). (ER-185). The indictment also included forfeiture allegations about approximately $16,394.44 seized from a Webull Financial, L.L.C. investment account and a sum of money reflecting the proceeds McClellon received from the alleged crimes. (*Id*).

A jury found McClellon guilty as charged. (ER-102).

The district court sentenced McClellon to a 42-month prison term and a three-year supervised release term. (ER-077-78). The court also ordered McClellon to pay $490,840.92 in victim restitution and a $500 special

assessment. (ER-078). The court also ordered forfeiture of the $16,394 in McClellon's Webull investment account seized by the Government.

McClellon filed a timely notice of appeal. (ER-199).

## Statement of Facts

**A.** **The Government's Case**

### 1. PPP and general industry practices

The Government's theory of the case was that McClellon obtained the loans designed to keep businesses afloat during the Covid-19 pandemic by submitting false information and documents about how many employees his companies had and the amount of payroll those companies had. Once McClellan obtained those funds, he used them to pay personal expenses and not for the purpose designed by the loan program.

The Paycheck Protection Program ("PPP") was a loan program designed to help businesses while they were shut down during the Covid-19 pandemic. (ER-105). It was a limited fund, which provided money to businesses on a first

come, first serve basis. (*Id*). One of this program's purposes was to help businesses retain employees. (*Id*). The reason behind it was that because of the Covid-19 pandemic and the resulting shutdowns ordered by state governments, businesses were required to stay closed. (*Id*). The PPP at first gave funding for about a two-month period for employers to keep paying their employees at their average wage. (ER-106).

To be eligible to receive money through the PPP, a business had to operate on or before February 15, 2020 and show proof of having a payroll or payment for contract labor. (ER-107). A business that came into operation after 2/15/20 would not be eligible for a loan. (ER-112-13). The first priority of the program was for businesses that had economic uncertainty. (ER-114.)

A loan application for this program asked prospective borrowers their average monthly payroll in 2019 or 2020 (a figure used as a basis to determine the loan amount). Borrowers also had to provide their draft 2019 tax returns

and other documents establishing the size of the payroll of the business. (ER-109). The loan application contains a certification by the prospective borrower that all information in the application is true. (ER-109-10). This information determines not only eligibility for the loan, but, also, how much money could be loaned to the prospective borrower. (ER-122.)

The PPP was administered by the Small Business Administration ("SBA") through private banks and other financial institutions. SBA would guarantee all PPP loans if they went into default. (ER-117).

Though the private lenders in the PPP sometimes created their own loan application forms, if their form were to omit certifications re: accuracy of payroll information, it would not be a legitimate PPP loan application. (1 RT 167.) Prospective borrowers also had to certify that loan funds would be used primarily for payroll costs, covered mortgage interest payments, and covered utility payments; no more

than 25 percent of the funds could go to non-payroll costs. (ER-119).

And if it were ultimately determined that the application did not have those certifications, the SBA could claw back the fees it paid to these lenders to disburse the loans. Nor would the SBA exercise on the loan a guarantee if the loan went into default. (ER-115).

Yet private lenders in the PPP were not required to double-check the accuracy of information the prospective borrower included in the loan application. (ER-115). There was no requirement for lenders to monitor how loan funds were used or whether they were placed in a dedicated account. (ER-118.) Applying for multiple PPP loans was permissible. (*Id*.)

### 2. Frostlake, LLC, loan

**Of t**he three PPP loans at issue here, one was made to a company called Frostlake, made by Cabbage (a small business lender in Atlanta, Georgia). (ER-123). On May 12,

2020, McLellon applied for PPP loan on behalf of a company called Frostlake, L.L.C.. (ER-134-135-137).

The application listed Frostlake's business address as 7909 37th Avenue South in Seattle. (ER-135-36).

In that application, McClellon certified that Frostlake had been in operation on February 15, 2020, and had employees for whom it paid salaries and payroll expenses or independent contractors. (ER-138). McClellon also certified that the company had been negatively impacted by the Covid-19-related shutdown. (*Id*).

McClellon supported this application with a bank statement purporting to show Frostlake making money in 2019, as well as a Schedule C from the 2019 tax return showing a net profit of $576,462 in 2019. (ER-139).

This loan was funded by Kabbage in the amount of $20,833. The money was transferred to a bank account in McClellon's name and wired out the next day. (ER-140).

///

///

- 8 -

### 3.  **Skylake LLC, loan**

On June 11, 2020, MClellon applied for another PPP loan on behalf of Skylake, LLC, from the First Home Bank and received $282,000 in PPP funds.  (ER-141)   McClellon received this money on August 4, 2020, but three weeks later, the money was wired to McClellon's personal account in a series of transactions.  (ER-145).

In Skyalke's loan application, the listed business address for Skylake was, again, 7909 37th Avenue South, Seattle, as was the phone and email information.  The purpose of the loan was to cover payroll, lease, mortgage interest, and utilities.  The loan application stated that Skylake has 13 employees and that the average monthly payroll is $104,815.42.  McClellon provided certification that this information is true.  (ER-140-41).

In support of this application, McClellon included what purports to be a Schedule C tax form for Skylake, which lists his name as a proprietor and $1,257,785 as income.  (ER-143).  McClellon also presented a document purporting to

- 9 -

show Skylake paying the Internal Revenue Service $440,000 in 2019.  (ER-144).

### 4.. Canonlake, LLC, loan

And McClellon applied to the Celtic Bank for a third PPP loan in the name of Cannonlake, LLC.   He received $197,315, which went to McClellon's bank account.  The loan application listed the business address for Cannonlake the same as for Frostlake and Skylake.  The application reported the average monthly payroll of $78,926 and 13 employees on the payroll.  The stated purpose of the loan was for lease, mortgage interest, payroll, rent, and utilities.  (ER-148-49).

Between the three companies, McClellon claimed to have 27 employees, with a monthly payroll of $190,000, which works out to an annual payroll of $2.3 million.  (ER-140).

### 5.   Use of the wires in Counts 1-3 and the bank fraud counts 4-5

Wire fraud in count 1 is based on the May 7, 2020, transmission of supporting documents to Kabbage for Frostalke's loan application.  (ER-177).

Wire fraud in Count 2 is based on an email exchange of May 8, 2020, between McClellon and Kabbage about the Frostlake loan.  (ER-124-177).

And wire fraud in Count 3 is based on the transmission of Frostlake's loan application with false documents and false certifications on May 12, 2020.  (ER-125-135).

Finally, as to bank fraud, Count 4 is based on June 11, 2020, submission of PPP loan application on with false information and false supporting documents on behalf of Skylake, LLC.  (ER-135-177-179).  And Count 5 is based on June 23, 2020, loan application with false supporting documentation on behalf of Skylake.  (2-ER-135-177-179).

### 6.    The investigation and trial

SBA eventually referred this matter to law enforcement about possible fraud on the loan applications.[1] (ER-173-174).  The investigation showed that the business address listed on each of the 3 loan applications was

---

[1] McClellon applied for several other PPP loans, but those applications were denied.

McClellon's residential address in Seattle.  (2 RT 80).  The
agent conducted spot checks of that address in February,
June, and August 20201, and found that it is a 2-story single
family residence, and there was no evidence of any business
activity. (ER-132-133). In May and June 2020 (when the
loans were given), McClellon still lived in Seattle, but he
moved to New York two months later.  (ER-133).

The agent found no evidence of McClellon having 27
employees.  (ER-132).  But he only interviewed one person –
McClellon's sister - and did not interview McClellon's
mother.  (ER-152-153).   Law enforcement never searched
the 37th Avenue address listed in the loan applications.  (ER-
154).

Plus, the money for each PPP loan went into
McClellon's personal accounts and was soon wired out of
there.  (ER-145).  The Radius bank account – the one listed
on the Celtic bank loan application was opened June 5, 2020,
with an initial deposit of $100.  (ER-168-169).  The letter

submitted with that loan application showed the opening date of the account as January 2020. (ER-170-171

In addition, the investigation revealed that the date of opening of the Cannnonlake bank account was changed from June 17, 2020, to January 17, 2020. (ER-148-149). And examination of the bank records showed that the bank statement submitted to support the Cannonlalke loan application was not an authentic bank statement. (ER-172-173).

And examination of corporate records showed no evidence of Frostlake, Skylake, or Cannonlake ever registering as an employer in the State of Washington or paying wages or taxes for any of these companies. (ER-155-157). There are no business licenses issued to any of these companies by Washington, which is something required for every business in the state that sells goods or provides services. (ER-159-162).

And corporate formation records show Frostlake was formed by McClellon in 2016, administratively dissolved in

2017, and then reinstated (through filing a statement) in 2021. (ER-163-164). Similarly, McClellon opened Skylake in 2016, dissolved it in 2017, reinstated and administratively dissolved it again in 2019, and again reinstated June 17, 2020. (ER-165). And as to Cannonlake, McClellon opened it in 2016, administratively dissolved in 2017, and reinstated June 17, 2020. (ER-165-167). All three companies list the 37th Avenue address in Seattle and McClellon's name and email address. (ER-165-167).

There is, however, a record of an unemployment claim filed by McClellon in April 2020, listing the same 37th Avenue address as in the loan applications. (ER-157. In that claim, McClellon stated that he did not work in another state for 18 months. (ER-158).

Finally, according to the Internal Revenue Service records, no tax returns were filed for Frostlake, Skylake or Cannonlake for the tax years 2018-2020. (ER-175). McClellon did not file a return for 2018, and his returns for 2019 and 2019 did not have a Schedule C (which would

- 14 -

report business expenses) or any taxable income.  (ER-127-131).

## B.    The Defense Case

The defense did not call any witnesses.  The defense's theory of the case was that the Government failed to prove beyond a reasonable doubt that the three companies in question did not actually exist and did not have employees receiving salaries.   (ER-180-182).  Another line of defense was that the Government failed to prove materiality of any of the allegedly inaccurate statements in the loan applications.  (ER-184).

## Summary of Argument

The district court erred in calculating the loss enhancement under § 2B1.1 using the intended loss amount of $743,996.   The term "loss" used in § 2B1.1 refers to only actual loss, which here is $500,048 and would result in a lesser advisory Guidelines range.   The district court's use of intended loss is based on guideline commentary, which unlawfully expanded that guideline scope.  *Kisor v. Wilkie,*

588 U.S. 558 (2019); *United States v. Banks*, 55 F.4th 246 (3d Cir. 2022); see also *United States v. Castillo*, 69 F.4th 648 (9th Cir. 2023); *United States v. Kirilyuk*, 29 F.4th 1128 (9th Cir. 2022).  This Court should vacate McClellon's sentence and remand for resentencing.

## Argument

### The District Court Erred in Enhancing McClellon's Offense Level Based on "Intended Loss" Because the Fraud Guideline Definition of Loss Unambiguously Refers Only to "Actual Loss;" the "Intended Loss" Directive Comes only from Guideline Commentary that Erroneously Expanded the Fraud Guideline Scope

### A.    Factual Background

The presentence report recommended calculation of the Guideline offense level based on the intended loss of $743996; the actual loss is $500,048.  (PSR ¶ 37).

The defense objected to the use of intended loss to calculate the Guideline and argued that only the actual loss should be used and that the loss enhancement must be based on actual loss, not intended loss.  (ER-096).

The district court overruled the objection and, based on the intended loss amount of $734,996, the court used a 14-level increase for the loss. (ER-039). Had the actual loss being used, the applicable enhancement would have been only 12 levels.

## B.  The Standard of Review is De Novo

Whether the guidelines allow the use of "intended loss" instead of *actual loss* is a legal question, which this Court reviews de novo. *Banks*, 55 F.4th at 251, n. 29; see also *Kirilyuk*, 29 F.4th at 1136 (reviewing de novo legal validity of § 2B1.1 commentary).

And the de novo standard here should apply despite McClellon not explicitly relying on *Kisor* and its progeny in support of his object to the use of intended loss in calculating the loss enhancement. *United States v. Pallares-Galan*, 359 F.3d 1088, 1094–95 (9th Cir. 2004), citing *Lebron vs. Nat'l Railroad Passenger Corp.*, 513, U.S. 374 (1995). Pallares-Galan's appeal argument in support of the underlying claim – that his state prior conviction did not qualify as a predicate

- 17 -

prior conviction – was merely an alternative theory in support of the same claim, not a new claim. *Id*. at 1095. As a result, de novo review, not plain error, applied there. *Id*.

Here, as well, because McClellon objected to the use of intended loss in calculating the loss enhancement, even if that argument did not explicitly embrace *Kisor*, it is only an alternative theory in support of the very same claim. Hence, de novo review, not plain-error review, must apply. *Pallares-Galan*, 359 F.3d at 1095.

In addition, for a separate reason, this Court retains discretion not to apply plain error and may review this claim de novo because the proper method of calculation of the loss enhancement is a purely legal issue and its consideration would not prejudice the Government. Determination of whether the intended loss commentary improperly expanded the scope of § 2B1.1 does not depend on consideration of any factual issues and the Government would have no legitimate interest in maintaining a sentence obtained through an illegal method of calculation of the loss enhancement.

- 18 -

And because plain-error review does not apply here, *United States v. Hackett*, _ F. 4th _, 2024 W 5151127 (9th Cir. 2024) does not require a different result.  In *Hackett*, a 2-1 opinion, the defendant's objection was *to the amount* of intended loss, not the legal propriety of its use.  *Id*. at 5-6.  For that reason, *Hackett* held that the defendant's objection in the district court did not sufficiently preserve the *Kisor* claim, and only plain-error review applied.

In contrast here, McClellon's objection in the district court was more broadly to the use of intended loss as a measure.[2]  (Defense sentencing brief at 4:13-20).   Thus, *Hackett* is materially different and does not control here.  The standard of review should be de novo.

///

///

---

[2] And to the extent that *Hackett* conflicts with prior decisions of this Court about waiver only applying to claims, not alternative theories in support of one, it was incorrectly decided and the en banc court should consider the issue and overrule it. *Miller v. Gammie*, 335 F.3d 889, 899–900 (9th Cir. 2003) .

- 19 -

Finally, as explained in Subpart D of this argument,

even if plain-error review applies, relief is warranted.

## C. The District Court Erred in Relying on Intended Loss Because USSG § 2B1.1 Use of "Loss" Unambiguously Refers to Actual Loss

### 1. Guideline commentary cannot expand the reach of guideline provisions

For fraud offenses, "[i]f the loss exceeded $6,500,"

U.S.S.G. § 2B1.1(b)(1) provides for incremental offense-level

increases based on the dollar amount of the loss.  Here,

using the intended loss of $743,996 resulted in a 14-level

enhancement.  (PSR ¶ 37; § 2B1.1(b)(1)(H)).  Had the district

court used the actual loss, the offense level increase would

have been 12, not 14.  § 2B1.1(b)(1)(G).  Reducing the final

offense level by 2 (from 23 to 21, with criminal history

category I, would reduce the advisory sentencing range from

46-57 months to 37-46 months.   The district court imposed

a 42-month sentence.  (ER-077).

The basis for the district court's calculation was not §

2B1.1, which does not explicitly define "loss."  Instead, the

court relied on commentary 3(A), which defines "loss" as the greater of the actual or intended loss.   (ER-039).

Yet as this Court has recently held, Sentencing Commission is not permitted to *expand* the reach of the guideline text by using commentary.   *Castillo*, 69 F.4th 648; see also Kirilyuk, 29 F.4th at 1139.

The reason for this rule lies in the joint application of two U.S. Supreme Court cases – *Stinson v. United States, 508 U.S. 36, 38–41 (1993)* and *Kisor*, 588 U.S. 558.  This Court addressed the interplay between those two cases in *Castillo*.  Under *Stinson*, Guideline commentary that interprets or explains the guideline is authoritative unless it violates the Constitution or a federal statute, or is inconsistent with or a plainly erroneous reading of the guideline.  *Stinson*, 508 U.S. at 39; *Castillo*, 69 F.4th at 655.

Though (as will be explained in a moment), the deference to guideline commentary under *Stinson* was broader before *Kisor*, in *Kirilyuk*, this Court cited *Stinson* in holding that guideline commentary to § 2B1.1 interpreting

"loss" for calculating offense level for credit card fraud was not authoritative because that commentary was plainly inconsistent with the meaning of "loss" under § 2B1.1. *Kirilyuk*, 29 F.4th at 1138–39.

Moreover, in *Kisor*, the arguably broader deference to guideline commentary under *Stinson* was narrowed. Under *Kisor*, any deference to an agency's interpretation of its own rule can arise only if that rule is genuinely ambiguous. *Kisor*, 588 U.S. 558; *Castillo*, 69 F.4th at 655. *Kisor* reasoned that even if a rule is ambiguous, not all reasonable agency constructions of the rule are entitled to deference. *Kisor*, 588 U.S. 558; *Castillo*, 69 F.4th at 655. But, more importantly, before concluding that a rule is genuinely ambiguous, a court must exhaust all the traditional tools of construction. *Id*. If uncertainty does not exist after exhausting those tools, there is no plausible reason for deference. *Id*.

*Castillo* held that the narrower deference standard under *Kisor* applies to Guideline commentary. *Castillo*, 69

- 22 -

F.4th at 655–56.  Under that standard, *Castillo* held that the reach of guideline § 4B1.2 cannot be expanded to inchoate offenses because the plain text of the guideline refers to only certain specific offenses meeting the definition of "controlled substance offences," which, under statutory construction canons, directs an inference that Congress intended to exclude other crimes from that specific definition.  *Castillo, 69 F.4th at 658*.

> ### 2. Application Note 3(A), which defines loss under USSG 2B1.1 as the greater of actual or intended loss, improperly expands the reach of the guideline; the plain meaning of loss here is actual loss

Though this Court has not yet addressed whether guideline commentary to § 2B1.1 can lawfully expand the definition of "loss" in that guideline, the Third Circuit answered that question with a "no" – application note 3(a) improperly expanded the scope of § 2B1.1's definition of loss to include intended loss.

///

///

- 23 -

*Banks* reached that conclusion by applying the *Kisor* analysis to § 2B1.1 and note (3)(A).  *Banks*, 255 F. 4th at 255-56.   The analysis begins with the plain language of the guideline it interprets.  *Banks*, 55 F.4th at 256–57.   *Banks* reasoned that this fact alone shows that the Commission did not intend to include "intended" loss in the definition.  *Id*. at 257.

That is so because there is a presumption that a word in a statutory definition carries its ordinary meaning. *Banks*, 55 F.4th at 257; *accord United States v. Korotkiy*, 118 F.4th 1202, 1210 (9th Cir. 2024) ("Unless a statute provides an explicit definition, we generally give words their ordinary, contemporary, common meaning").

*Banks* then went through various dictionary definitions of "loss," none of which suggested that ordinary meaning of loss include intended loss.  *Banks*, 55 F.4th at 257–58. Instead, those definitions point to actual loss as the ordinary meaning of loss.  *Id*.  Thus, because application note 3(A) expanded the definition of loss beyond the plain text of the

- 24 -

Guideline, *Banks* found the commentary not authoritative and remanded for resentencing without use of intended loss enhancement. *Id*. at 258.

Here, for several reasons, this Court should follow *Banks*. *Banks* faithfully applied the *Kisor* framework.

*Banks* also tracks with Castillo, which held that guideline commentary is subject to a more stringent standard for deference. *Castillo*, 69 F.4th at 655.

It also mirrors *Kirilyuk*, which, applying a broader deference under *Stinson*, held that guideline commentary defining "loss" in credit card cases as an automatic $500 per card was invalid because it contradicted the ordinary meaning of loss in § 2B1.1 *Kirilyuk*, 29 F.4th at 1137–38.

Here, too, as *Banks* aptly described, the ordinary meaning of "loss" is actual loss, which makes the intended loss used in the commentary plainly inconsistent with the guideline definition of loss. This Court should so hold.

///

///

- 25 -

3.    **The Fourth Circuit's 2-1 decision in *Boler* does not compel a different result; this Court should instead follow *Banks* and the *Boler* dissent**

Finally, while we acknowledge that the 2-judge majority in *United States v. Boler*, 115 F.4th 316 (4th Cir. 2024) recently held that note 3(A) is entitled to deference under *Kisor*, the Court should not follow *Boler* majority.[i] Instead, the dissent in *Boler* has the better argument. And this commentary is not authoritative.

In finding this guideline commentary authoritative under *Kisor*, the *Bowler* majority applied the *Kisor* framework to note 3(A) to § 2B1.1, but found the definition of loss genuinely ambiguous. *Bowler* cited multiple dictionary definitions of "loss" only as proof that loss can mean different things in different contexts. *Boler*, 115 F.4th at 324. The court also saw additional proof of ambiguity in the relevant conduct guideline and the need to avoid unwarranted sentencing disparities. *Boler*, 115 F.4th at 325–26. And the court ultimately found that because the guideline is genuinely ambiguous, the Sentencing Commission's

interpretation was within the zone of ambiguity and implicated the commission's expertise, deference to the commentary 3(a) definition of loss to include intended loss was proper. *Boler*, 115 F.4th at 328.

The majority's application of *Kisor* to this guideline commentary is problematic for the reasons aptly laid out by dissenting judge in that case (and in *Banks*). The only reasonable inference from the various dictionary definitions of the term "loss" is that all definitions refer to an actual, realized loss. *Boler*, 115 F.4th at 330. None of the definitions cited by the Government, whether involving tangible or intangible losses, refers to anything other than actual losses. *Id.* at 331. Similar result follows when Corpus Linguistics – another tool for interpreting the meaning of statutory language – is used. *Id.* at 332-333.

And aside from the plain text of § 2B1.1, the structure, history, and purpose of the guidelines also support interpreting loss in § 2B1.1 as unambiguously refereeing to actual loss. *Boler*, 115 F.4th at 335. For example, if the

relevant conduct guideline truly expands the loss definition in § 2B1.1 to include intended loss, there would not have been a need for a "tax loss" definition in § 2T1.1(c) that specifically includes intended loss. Statutory interpretation canons counsel against a statutory reading that renders another provision superfluous. *Id*. at 335-36.

In addition, limiting loss under § 2B1.1 to actual loss does not result in *unwarranted* sentencing disparities. The dissent cited an example in which two defendants intend to steal a $1,000,000, but only one of the succeeds while the other only obtains $1,000. *Boler*, 115 F.4th at 336. Treating their crimes different for sentencing purposes does not result in an *unwarranted* sentencing disparity because they caused different harm. *Id*.

In contrast, treating loss as the greater of intended or actual loss promotes neither fairness nor certainty. With that definition, a defendant is left wondering how a sentencing court would calculate his subjective, intended loss. *Boler*, 115 F.4th at 336. And there would be nothing

- 28 -

fair about treating the same for sentencing purposes two defendants who may be convicted of the same crime but cause vastly different financial harm. *Id*. at 336-37.

Finally, the legislative history of the guidelines shows that the prior version of the fraud guideline included intended loss. But that provision had been deleted in 2001; it has been replaced by § 2B1.1, which survives to this day. *Boler*, 115 F.4th at 337–38. The difference in the definition of loss between the prior and the current guideline version is presumed to be intentional. *Id*.

In sum, the *Boler* dissent aligns with Banks and this Court's jurisprudence in applying *Kisor* and *Stinson* to guideline commentary. This Court should follow those decisions and hold that (1) loss under § 2B1.1 is limited to actual loss and (2) application note 3(A) expanding that definition to include intended loss is not authoritative.

///

///

///

- 29 -

4. **This Court should vacate  sentence and remand for resentencing without the intended loss enhancement**

Because the district court erred in relying on intended loss enhancement to calculate McLellon's advisory Guidelines range, this Court should remand for resentencing.  See, e.g., *United States v. Klensch*, 87 F.4th 1159, 1166 (9th Cir. 2023) ("Errors that impact Guideline calculations typically require remand unless the Government establishes the error was harmless").

Here, the Government could make no such showing. The district court's 42-month sentence was a downward variance from then-applicable 46-57 months range, likely based on McClellon's history of mental health issues and lack of criminal history.  (ER-077-078).  The court may well choose to go with a similar downward variance form the new 37-to 46 months range, especially if McClellon's rehabilitation in prison has been successful.  The district court made no statements on the record showing a clear

intent to impose the same sentence even if the advisory

range was lowered.  (ER-077-078).

**D.    The Court Should Not Review for Plain Error; But the Error Here Requires a New Sentencing Hearing Even Under Plain-error Review**

**1.    This Court should review the issue de novo because it is a purely legal question and addressing it for the first time on appeal would not prejudice the Government**

Though the Government may argue that this Court

should only review for plain error, the Court should reject

that argument.   As this Court recently reaffirmed in *United

States v. Gomez,* 115 F.4th 987 (9th Cir. 2024), when, as

here, the appeal presents a pure question of law and the

Government would not be prejudice by considering the

merits, this Court may choose to apply de novo review.  *Id.*

at 990, citing *United States v. Eckford,* 77 F.4th 1228, 1231

(9th Cir. 2023).

And this Court has applied this principle in sentencing

error cases.  See e.g., *United States v. McAdory,* 935 F.3d

838, 841–42 (9th Cir. 2019) (de novo review for claim

whether the defendant's prior conviction qualifies as a

- 31 -

predicate crime under 18 U.S.C. § 922(g)(1)); see also

*Castillo*, 69 F.4th at 653 (applying de novo to whether the

defendant's prior conspiracy conviction is a "controlled

substance" offence under the Career Offender guideline).

Here, too, this Court should apply the de novo

standard. As noted earlier, whether the intended loss

guideline commentary is an improper expansion of that

guideline's scope is a pure question of law.

Nor can there be any prejudice to legitimate

Government interest from considering whether the district

court calculated the offense level using a legally permissible

loss measure. And resolution of this issue does not rely on

factual record development.

And there are more reasons to apply the de novo

standard. Though McClellon did not present this specific

challenge to the use of intended loss guideline commentary,

McClellon did argue that only actual loss, not intended loss,

should be used and the district court overruled the objection.

(ER-096). So this is not an issue that should surprise the

Government.  Once a party preserves a claim – which McClellon did here – he is free to "make any argument in support of that claim; parties are not limited to the precise arguments they made below." *Id.* at 1175. *Kirilyuk*, 29 F.4th at 1136.

For these reasons, this Court should apply the de novo standard.

### 2.   McClellon should prevail even under the plain-error standard

We acknowledge that *Hackett* held that any error in relying on the intended loss commentary was not clear and obvious.[3]  As discussed earlier, the standard of review here should be de novo, either because McClellon's objection sufficiently preserved the claim or as an exercise of this Court's discretion.  Finally, even if Hackett applies here, it was incorrectly decided and should be overruled by the en bank court.   *Hackett*, 2024 WL, * 15, fn. 2 (dis. opn Berzon, J (sentence had to be vacated for other reasons, so there was

---

[3] See also *United States v. Benlevi*, No. 22-50163, 2024 WL 5375881 (9th Cir. Feb. 4, 2025) (same).

- 33 -

no need for *Hackett* to conduct plain-error review of the *Kisor* challenge to the intended loss commentary).

As to the merits of plain-error analysis, the legal standard is well settled. "Plain error is (1) error, (2) that is plain, and (3) that affects substantial rights." *United States v. Waknine*, 543 F.3d 546, 551 (9th Cir. 2008) (cleaned up). If these three conditions are met, this Court may exercise its discretion to grant relief if the error "seriously affects the fairness, integrity, or public reputation of judicial proceedings." *Id.*

i.    *Use of intended loss commentary was plain error*

Here, in determining whether the error was plain, the error must only be plain at the time of the appeal. *Henderson v. United States*, 568 U.S. 266, 273 (2013). Thus, if the Court agrees that the intended loss commentary improperly expanded § 2B1.1's scope, the error is plain if, with the benefit of hindsight, the district court's loss calculation was plainly wrong, not questionably wrong. *United States v. Irons*, 31 F.4th 702, 713 (9th Cir. 2022).

- 34 -

*Irons* held, in circumstances analogous to this case, that the analysis was sufficiently one-sided and sufficiently dictating only one answer for the error to be plain. 31 F.3d at 713-14. And the plain error finding stood despite the district court following an unpublished decision of this Court. *Id*.

Here, at the time of the sentencing hearing in May 29, 2024, the Supreme Court had decided Kisor and *Stinson*, and two Ninth Circuit decisions have extended those Supreme Court cases to guideline commentary (including § 2B1.1) (*Kirilyuk* and *Castillo*). And though the Circuit has not yet addressed in a published opinion whether the intended loss commentary is an improper expansion of "loss" definition in § 2B1.1, the answer under *Kisor* is sufficiently clear and one-sided to make the error plain. *Irons*, 31 F.4th at 713–14. Thus, it is of no moment that at the time of sentencing, there was a split of *out-of-circuit* authority about whether this commentary is invalid under *Kisor*.

///

- 35 -

ii.    *The error affected McClellon's substantial rights*

This element is met because if the error had not

occurred, there is a reasonable likelihood that McClellon

would have received a shorter sentence.  With the advisory

range being 46-57 months, the district court was willing to

grant a downward variance based on McClellon's lack of a

prior criminal history and mental health issues.  (ER-072-

73).  The court made no statements showing a clear intent to

impose the same sentence even if the Guideline range was

lower than 46 to 57 months.  And it is possible that the court

may be inclined to give a downward variance based on

McLellon's rehabilitation in prison.   Thus, the third prong of

the plain-error analysis is met.

iii.    *The Court should exercise its discretion to correct*
*the error*

As discussed earlier, the district court's use of intended

loss led to a higher Guidelines range (46-57 months) than

the one resulting from using actual loss (36-46 month).  As a

result, because there is a reasonable possibility that the

district court would have chosen a lesser sentence if the

- 36 -

lesser range applied, this plain prejudicial sentencing error should be corrected. *Rosales-Mireles v. United States*, 585 U.S. 129, 141 (2018) ("In the context of a plain Guidelines error that affects substantial rights, that diminished view of the proceedings ordinarily will satisfy Olano 's fourth prong, as it does in this case"); *accord United States v. Hanson*, 936 F.3d 876, 885 (9th Cir. 2019) (sentencing error satisfied the fourth element of plain-error analysis).

## Conclusion

For these reasons, this Court should reverse McClellon's sentence and remand for a new sentencing hearing.

DATE:  February 26, 2025          By:  s/ Gene D. Vorobyov

                                   Attorney for Appellant
                                   DONTE McCLELLON

---

[i] See also *United States v. You*, 74 F.4th 378 (6th Cir. 2023) (using *Kisor* analysis to find the loss commentary authoritative); but see *United States v. Smith*, 79 F.4th 790, 790–800 (6th Cir. 2023) (conc. opn. of Nalbandian, J.)

(disagreeing with *You*'s analysis and conclusion that "loss" in § 2B1.1 is ambiguous).

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)**  | 24-3406

I am the attorney or self-represented party.

**This brief contains** | 5,820 | **words,** including | 0 | words manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

(●) complies with the word limit of Cir. R. 32-1.

( ) is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

( ) is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

( ) is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

( ) complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
  - [ ] it is a joint brief submitted by separately represented parties.
  - [ ] a party or parties are filing a single brief in response to multiple briefs.
  - [ ] a party or parties are filing a single brief in response to a longer joint brief.

( ) complies with the length limit designated by court order dated [          ].

( ) is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** | s/ Gene D. Vorobyov | **Date** | 02/26/2025

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 8**                                                                 *Rev. 12/01/22*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 17. Statement of Related Cases Pursuant to Circuit Rule 28-2.6

*Instructions for this form: http://www.ca9.uscourts.gov/forms/form17instructions.pdf*

**9th Cir. Case Number(s)** | 24-3406

The undersigned attorney or self-represented party states the following:

(•) I am unaware of any related cases currently pending in this court.

( ) I am unaware of any related cases currently pending in this court other than the case(s) identified in the initial brief(s) filed by the other party or parties.

( ) I am aware of one or more related cases currently pending in this court. The case number and name of each related case and its relationship to this case are:

**Signature** | s/ Gene D. Vorobyov     **Date** | 02/26/2025

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 17**                                                              *New 12/01/2018*